## In re National Foundation of Dramatic Arts

*J. E. Gallagher, Jr.,* for petitioners.

ALESSANDRONI, J., December 11, 1947.—An application for a charter of a nonprofit corporation under the Nonprofit Corporation Law of May 5, 1933, P. L. 289, 15 PS §2851, having been filed, the matter was referred to a master to investigate, take testimony submitted on behalf of applicants and to report thereon. The report of the master was filed November 12, 1947, in which there is a recommendation that a charter be granted.

In considering applications for the creation of nonprofit corporations, we must be guided by the spirit of the act of the legislature which by definition excludes any corporation whatsoever organized for any purpose involving pecuniary profit incidental or otherwise to its members. (Article I, sec. 2.) The limitation imposed by the act is negative in its terms in that qualified persons are permitted to form a nonprofit corporation "under the provisions of this act for any purpose or purposes which are lawful and not injurious to the community". (Article II, sec. 201.) The duty of the court is described in article II, sec. 207, in the following language:

"If the Court shall find the articles to be in proper form and within the provisions of this act, and the purpose or purposes given in the articles to be lawful and not injurious to the community, the court shall so certify on the articles . . .".

This does not mean, however, that the court has been circumscribed by a limitation permitting it to function only in a ministerial capacity and to determine matters of form and superficial expressions of

purpose: Rox Athletic Assn. Charter Application, 318 Pa. 258.

On the contrary our Supreme Court has stated in Phila. Labor's N.-P. L. Club's App. for Inc., 328 Pa. 465, at page 469:

"The duty of the court is somewhat different in passing upon charter applications laid before it from what it is in some other matters, because it is required by the law to certify that the purpose or purposes given in the articles are lawful and not injurious to the community. The applicants must satisfy the court as to the propriety of its certificate, 'otherwise', in the language of the act 'the court shall refuse the application'. It should always be borne in mind that in charter applications the applicants are asking the court for a special privilege as to the propriety of granting which, its conscience must be satisfied. In Deutsch-Amerikanischer Volksfest-Verein, 200 Pa. 143, 145, 49 A. 949, we said: 'The court undoubtedly may and should look into the nature of the proposed social enjoyment, to see that it is "lawful and not injurious to the community." ' "

We are of the opinion that the phrase "within the provisions of the act" read in conjunction with the entire statute requires the court to determine whether this special privilege shall be granted without restricting itself merely to ascertaining whether there has been compliance with the formal requirements.

We appreciate the discretion which is lodged with the court of common pleas in granting and refusing charters, particularly since the exercise of that discretion will not be reviewed by an appellate court unless there is a manifest abuse such as the violation of a deep-seated public policy: Indep. Garment Workers' Union of Valley View Case, 335 Pa. 209; In re Elkland Leather Workers' Assn., Inc., 330 Pa. 78. We cannot, however, reconcile ourselves to the conclusion that the legislature intended the courts of common

pleas to grant charters for nonprofit corporations indiscriminately. We believe that it is relevant to determine whether the proposed activities of the organization can be conducted as well without the veil of a nonprofit corporation charter: Rox Athletic Assn. Charter Application, supra. The inability of the granting power to police and supervise the conduct of nonprofit corporations after a charter has been granted is conducive to one present existing evil in the prevalence of one-man clubs. Moreover, the inherent right of such a corporation to amend its original bylaws is pregnant with potential evil.

The views of this court have been stated expressly in the cases of Incorporation of Automatic Phonograph Owners Assn., 45 D. & C. 551, and In re American League of Theatrical Arts, etc., 48 D. & C. 700. We have been deprived of the benefit up until this time of an appellate review of our interpretation of the Nonprofit Corporation Law of 1933. In the former case we discussed the restriction concerning "pecuniary profit, incidental or otherwise, to the members". In the latter case we stated that although not articulated in our Nonprofit Corporation Law, there is a sense of public interest and public benefit to be reckoned with in the grant of a nonprofit charter and that the resulting privileges and immunities to be enjoyed by the grant of such a charter should not lightly be conferred without some quid pro quo for the community. There should appear affirmatively a reason or function of general interest which would be served by the grant of the application. We believe that the term "not injurious to the community" is not solely negative in its connotation and does not require that there appear affirmatively an injurious effect on the community by the operation of such an association. The injurious effect of the indiscriminate grant of such charters is well illustrated by the existence of many spurious associations which do little more than meet the literal re-

quirements of the statute. Moreover, we cannot be restricted to the purposes superficially set out in the articles of incorporation which frequently becloud the manifested real purpose.

Examining the instant application in the light of these principles we are at once aware that we have before us a flourishing and existing business, which has been conducted as such for the past 29 years and which will be conducted as a business in its economic meaning hereafter under the guise of a nonprofit corporation. Bessie V. Hicks for a number of years has conducted a school of dramatic arts in the City of Philadelphia. Since 1941 she has been assisted by her husband John A. Bowman, who has devoted his services as a full-time administrator and has shared equally with his wife the resultant net profits. The applicants for the present charter consist of Mr. and Mrs. Bowman, an unidentified person by the name of William A. Bowman, who is apparently a relative, an individual by the name of Helen Greer Israel, and counsel for applicant in the instant proceedings. At the two meetings conducted by the master the testimony was largely restricted to that of Mr. Bowman, corroborated broadly by statements of counsel who was sworn as a witness.

The purposes of the proposed corporation are stated as follows: "The purpose for which the corporation is formed is to encourage, promote and foster the study and practice of self-expression, dramatic art and other fine arts in all their phases from design and authorship to production and exhibition, by financial and professional assistance to individuals, groups, or projects interested in such arts, by the exposition and demonstration of the theories and techniques of such arts, by providing general educational facilities and by all cognate activities." It is apparent that this statement of purposes could just as adequately comply with the Business Corporation Law. The control of the proposed corporation is vested in these five persons and

from all of the testimony we can only arrive at the reasonable inference that Mr. and Mrs. Bowman will continue as the real parties in interest flanked by three individuals necessary for conformance to the statutory requirements. The only provision for the admittance of additional persons will be for those who endow the organization or contribute services thereto. It is significant that the bald statement in this regard is not elaborated upon.

It is proposed that the new corporation, which now has $500 in assets, proceeds of the purchase of five shares by Mr. and Mrs. Bowman at the par value of $100 each, take over the assets of the existing business at an appraised value. Mr. Bowman estimated that the physical assets are worth approximately $12,000 to $15,000. The authorized capital structure is limited to 100 shares each having a par value of $100 or the total sum of $10,000. Any differential between the authorized capital and the appraised value of the assets will be met by the issuance of notes to Mr. and Mrs. Bowman. We are not advised whether those notes will be interest-bearing or whether they will cover the sum of $125,000, which Mr. Bowman estimated as the value of the good will of the business.

The treatment of salaries is consistent with the entire theory of this application and is likewise most significant. The school in 1941 was comprised of approximately 30 full-time students. It has presently enlarged and there are now 125 students. Each student pays the sum of $500 a year as tuition and the expenses of the organization are largely those of salaries to its 15 full-time teachers. There are, in addition, part-time teachers and evening students who take one evening's instruction for a period of 30 weeks. Mr. Bowman testified that in 1941 the net profits, which he divided equally with his wife for the year, were approximately $1,500, although he failed to include in net profits the sum of $5,000 which he stated had been

"plowed back" into the business, apparently for extension purposes or the purchase of physical assets. By the end of 1946 the net profits were equivalent to approximately $14,000, including a "plow back" of $10,-000, which were again equally divided between Mr. and Mrs. Bowman. In what perhaps was an unguarded moment, Mr. Bowman stated that the new corporation would pay a combined salary to Mr. and Mrs. Bowman of $16,000, although at the second meeting he amended his declaration by stating that there had been no agreement with the proposed board of directors and of course no commitment in advance. Most significantly he conveyed the impression, however, that the salaries would be commensurate with the services, which appears to be an indirect way of stating that they would be aligned with the net profits.

It appears to us that the statements of the reasons for this application constitute an attempt to disguise what would otherwise be a business corporation. We are not impressed by the expectation that some day the incorporators are hopeful of securing enough endowments to increase the number of scholarships from the three present beneficiaries to the number possibly equivalent to the total enrollment, nor are we impressed by the statement that representatives will be sent to the public schools to inspire an interest in the dramatic arts since this practice has been in existence for many years as good business promotion.

We do not have the type of operating history which would indicate that the new organization comes within the spirit of the Nonprofit Corporation Law. This has been a business for 29 years and will continue to be a business with the lofty name of National Foundation of Dramatic Arts. Minor changes in form have no effect upon the substance with which we are dealing and which has not changed. It would be substantially different if the applicants were a large group of public-minded citizens who had gathered together for the

purpose of inspiring an interest in the dramatic arts and who were willing to contribute even a relatively small sum for the working capital of the endeavor.

We cannot escape the belief that the proposed application was inspired by the decision in Laureldale Cemetery Assn. v. Matthews et al., 354 Pa. 239, a decision which we believe to be poor precedent for the purpose for which it is advanced. That was an action by a bill in equity to secure a tax exemption under The General County Assessment Law of May 22, 1933, P. L. 853, sec. 204. The propriety of a grant of a charter to a cemetery as a nonprofit corporation was not in issue and could not be attacked collaterally. Moreover, the conversion of a cemetery from a business corporation into a nonprofit corporation clearly indicated that as a business matter it was not prudent. We are mindful of the expression contained therein that reasonable compensation for labor or services rendered by officers of a nonprofit corporation is not profit, but we do not believe that drawing off in the form of salaries the net profits formerly accruing to co-venturers in a business complies with the provisions and spirit of the Nonprofit Corporation Law. Merely molding the present business into the form outlined in that decision does not satisfy the conscience of this court that this application is worthy of favorable consideration. We can see no reason why the existing business cannot be continued as such without a charter just as effectively, although perhaps more expensively because of the obligation for the payment of taxes. We do not believe that the Nonprofit Corporation Law was meant as a shield against taxation of private enterprise.

## Order

Now, to wit, December 11, 1947, upon consideration of the application, the articles of incorporation, and the evidence submitted on behalf of applicants, it appear-

ing that the said articles are not in compliance with the provisions of the Nonprofit Corporation Law of May 5, 1933, P. L. 289, the application is refused.